**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| Angel Rivera, | : | Case No. 1:12 CV 865 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| Commissioner of Social Security, | : | **MEMORANDUM** |
| Defendant, | : | **AND ORDER** |

## I. INTRODUCTION

Plaintiff Angel Rivera ("Plaintiff") seeks judicial review, pursuant to 42 U.S.C. § 405(g) of Defendant Commissioner's ("Defendant" or "Commissioner") final determination denying his claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI, respectively, of the Social Security Act, 42 U.S.C. §§§ 416(i), 423, and 1381 (Docket No. 1). Pending are the parties' Briefs on the Merits (Docket Nos. 15 and 17). For the reasons that follow, the decision of the Commissioner is affirmed.

1

## II. PROCEDURAL BACKGROUND

On December 9, 2008, Plaintiff filed an application for a period of DIB under Title II of the

Social Security Act, 42 U.S.C. §§ 416(i) and 423 (Docket No. 10, p. 95 of 395). On that same day,

Plaintiff filed an application for SSI under Title XVI of the Social Security Act, 42 U.S.C. § 1381

(Docket No. 10, p. 97 of 395). In his application, Plaintiff alleged a period of disability beginning

August 11, 2008 (Docket No. 10, pp. 95, 97 of 395). Plaintiff's claims were denied initially on March

25, 2009 (Docket No. 10, pp. 67-76 of 395), and upon reconsideration on June 29, 2009 (Docket No.

10, pp. 80-88 of 395). Plaintiff thereafter filed a timely written request for a hearing on September 28,

2009 (Docket No. 10, p. 89 of 395).

On December 10, 2010, Plaintiff appeared with counsel for a hearing before Administrative

Law Judge Kenneth B. Terry ("ALJ Terry") (Docket No. 10, pp. 37-62 of 395). Also appearing at the

hearing was an impartial Vocational Expert ("VE") (Docket No. 10, p. 39 of 395). ALJ Terry found

Plaintiff to have a severe combination of chronic obstructive pulmonary disease ("COPD"), diabetes

mellitus, obesity, emphysema, asthma, and sleep apnea, with an onset date of August 11, 2008 (Docket

No. 10, p. 25 of 395).

Despite these limitations, ALJ Terry determined, based on all the evidence presented, that

Plaintiff had not been disabled within the meaning of the Social Security Act at any time from the

alleged onset date through the date of his decision (Docket No. 10, p. 32 of 295). ALJ Terry found

Plaintiff had the residual functional capacity to perform a range of light work with the following

limitations:

1. Limited to positions where English is not required.
2. Must avoid concentrated exposure to respiratory irritants, dust, fumes, or
   temperature extremes.

(Docket No. 10, p. 25 of 395). ALJ Terry found Plaintiff retained the ability to: (1) lift and/or carry and

push and/or pull twenty pounds occasionally and ten pounds frequently; (2) sit for six hours at a time up to a total of eight hours during an eight-hour workday; and (3) stand and/or walk for two hours at a time up to a total of six hours during an eight-hour workday (Docket No. 10, p. 25 of 395). Additionally, ALJ Terry found Plaintiff capable of performing his past relevant work as a food assembler (Docket No. 10, p. 30 of 395). Plaintiff's request for benefits was therefore denied (Docket No. 10, p. 32, of 395).

On April 10, 2012, Plaintiff filed a Complaint in the Northern District of Ohio, Eastern Division, seeking judicial review of his denial of DIB and SSI (Docket No. 1). In his pleading, Plaintiff alleged the ALJ's decision was not supported by substantial evidence with regard to either: (1) meeting the criteria of § 3.03 of the Listed Impairments; or (2) Plaintiff's residual functional capacity (Docket No. 15). Plaintiff also alleged that the ALJ erred by relying on VE testimony that directly conflicted with the Dictionary of Occupational Titles ("DOT"), for which no explanation was provided (Docket No. 15). Defendant filed its Answer on July 2, 2012 (Docket No. 9).

### III. FACTUAL BACKGROUND

**A.    THE ADMINISTRATIVE HEARING**

An administrative hearing convened on December 10, 2010 (Docket No. 10, p. 37 of 395). Plaintiff, represented by counsel Samuel Ruhe, appeared and testified (Docket No. 10, pp. 45-51 of 395).[1] Also present and testifying was VE Bruce Holderead ("Mr. Holderead") (Docket No. 10, pp. 52-61 of 395).

---

[1] Given Plaintiff's limited English-speaking capabilities, his answers were provided to the ALJ through the use of a Spanish interpreter (Docket No. 10, p. 39 of 395).

1.    PLAINTIFF'S TESTIMONY

At the time of the hearing, Plaintiff was a forty-seven-year old married man who resided with his wife and twelve-year old daughter (Docket No. 10, p. 50 of 395). Plaintiff testified that his wife was also on disability (Docket No. 10, pp. 50-51 of 395). Prior to his disability, Plaintiff held a variety of jobs, his most recent employment being a machine operator for Park Ohio (Docket No. 10, p. 50 of 395). Plaintiff testified that he last worked on August 11, 2008 (Docket No. 10, p. 50 of 395), and that he subsequently received unemployment benefits, which had run out shortly before the administrative hearing (Docket No. 10, p. 51 of 395).

Plaintiff suffers from a combination of impairments, including COPD and diabetes. With regard to his diabetes, Plaintiff testified that he was diagnosed with the disease in 2005 and was currently taking two types of insulin plus a pill to regulate his symptoms (Docket No. 10, p. 49 of 395). Plaintiff claimed the diabetes medications were ineffective (Docket No. 10, p. 49 of 395). Plaintiff's blood sugar was, in his own words, "totally out of control," with his sugar levels often ranging from 280 to 300 (Docket No. 10, p. 46 of 395). When his blood sugar is high, Plaintiff stated that he loses his vision and starts shaking (Docket No. 10, p. 46 of 395). When it is low, Plaintiff blacks out (Docket No. 10, p. 46 of 395). Plaintiff also testified that he experiences numbness and tingling in his hands and feet on a daily basis as well as fatigue when his blood sugar is uncontrolled (Docket No. 10, pp. 46-47 of 395). Plaintiff stated that his uncontrolled diabetes also affects his breathing, making it more difficult (Docket No. 10, p. 47 of 395).

Plaintiff's breathing difficulties also began in 2005 (Docket No. 10, p. 45 of 395). According to Plaintiff, his COPD has gradually gotten worse, to the point that, three weeks prior to the administrative hearing, Plaintiff began using oxygen twenty-four hours a day (Docket No. 10, p. 45 of

4

395). Plaintiff testified that he has to sleep in his living room because he cannot climb the stairs to the bedroom (Docket No. 10, pp. 45-46 of 395). Plaintiff stated that he requires assistance to tie his shoes and shower (Docket No. 10, p. 46 of 395). He also indicated that his breathing difficulties wake him up at night, usually every thirty to forty minutes (Docket No. 10, p. 47 of 395).

When asked about his daily activities, Plaintiff indicated that he does nothing during the day and stated that when he needed something, he had to request help (Docket No. 10, p. 50 of 395). Plaintiff testified that he could walk no more than ten to fifteen steps without stopping and that he only leaves his house to go to his appointments (Docket No. 10, pp. 47-48 of 395). Plaintiff indicated that he would even become short of breath when he was sitting or laying down (Docket No. 10, p. 48 of 395).

In addition to the insulin and constant oxygen use, Plaintiff testified that he was also on medication for his blood pressure and emphysema (Docket No. 10, p. 49 of 395).

### 2. VOCATIONAL EXPERT TESTIMONY

Having familiarized himself with Plaintiff's file and vocational background prior to the hearing, the VE testified that Plaintiff had several positions that could be considered prior employment: (1) roofing helper, light and unskilled DOT 869.687-026; (2) tractor-trailer moving van driver helper, medium and semiskilled DOT 904.687-010; (3) food assembler, light and semiskilled DOT 319.484-010; and (4) machine feeder, light and unskilled DOT 699.686-010 (Docket No. 10, p. 54 of 395).[2] The VE indicated that there was no transferability of skills from any of these jobs (Docket No. 10, p. 55 of 395).

---

[2] It should be noted that these exertional levels correspond with how Plaintiff performed the job, not how the job was normally performed in the national economy.

ALJ Terry then posed the first of four hypothetical questions:

Assume a 47-year-old individual with a high school education with inability to speak English. Assume that person was capable of performing light work with ability to lift and/or carry and push/pull ten pounds frequently, [twenty] pounds occasionally, sit for six hours at a time during the total eight hours per work day, with ability to stand and/or walk a total of six hours throughout a normal eight-hour work day. No limitations regarding climbing, balancing, stooping, kneeling, crouching and no limitation regarding manipulation with no environmental limitations. No mental limitations other than the fact that he can't speak English. Would that person be able to perform any of those jobs that we mentioned earlier?

(Docket No. 10, pp. 55-56 of 395). Taking into account these limitations, the VE testified Plaintiff could return to the food assembler job as performed in the national economy as well as the machine feeder position at the level at which Plaintiff previously performed (Docket No. 10, p. 56 of 395). The VE also indicated that there were other jobs that such an individual could perform including, but not limited to: (1) cleaner, housekeeping, listed under DOT 323.687-014, for which there are 370,000 jobs nationally and 3,000 in the State of Ohio; (2) production assembler, listed under DOT 706.687-010, for which there are 250,000 jobs nationally and 3,000 in the State of Ohio; (3) electrical accessories assembler, listed under DOT 729.687-010, for which there are 50,000 jobs nationally and 700 in the State of Ohio (Docket No. 10, p. 56 of 395).

ALJ Terry then posed his second hypothetical:

[A]ssume that the person has the same educational background, the same work history, with an inability to speak English, but is limited to sedentary work with the inability to lift and/or carry more than ten pounds occasionally, with the inability to stand or walk for more than two hours per eight-hour work day, sit for approximately six hours out of a work day, with the inability to . . . perform activities in temperature extremes . . . [a]nd no concentrated exposure to dust, fumes, respiratory irritants. Would this individual be able to perform any of the past jobs you identified in past work?

(Docket No. 10 pp. 57-58 of 395). VE Holderead indicated that an individual with these limitations could not return to any of Plaintiff's past work (Docket No. 10, p. 58 of 395). However, the VE

6

testified that there would be other work that such an individual could perform including, but not limited to: (1) final assembler, listed under DOT 713.687-018, for which there are 30,000 jobs in the State of Ohio and 350 in northeast Ohio; (2) touch-up screen printed circuit board assembler, listed under DOT 726.684-110, for which there are 50,000 jobs nationally and 750 in northeast Ohio; and (3) film touch-up inspector, listed under DOT 726.684-050, for which there are 50,000 jobs in the national economy and 700 in northeast Ohio (Docket No. 10, p. 58 of 395).

In his third hypothetical, ALJ Terry posed the following:

. . . assume the same hypothetical individual as in hypothetical one which was one of the light, but with the limitations precluding more than concentrated . . . exposure to temperature extremes and . . . with no exposure . . . to fumes, dust and respiratory irritants. Would they be able to do the past relevant work?

(Docket No. 10, pp. 58-59 of 395). The VE indicated that such an individual would only be able to perform Plaintiff's prior food assembler job but could perform all the other jobs as previously described (Docket No. 10, p. 59 of 395).

ALJ Terry then posed his fourth and final hypothetical:

Limited to sedentary as described in hypothetical number two. Lifting, carrying, pushing, pulling no more than ten pounds occasionally; standing and walking only two hours per eight-hour day; with the same environmental limitations in hypo two; no concentrated exposure to respiratory irritants or temperature extremes. Add with the need to take multiple breaks during the work day to rest, approximately being off job task for [thirty] minutes at a time, two times a day. Would that individual be able to perform any of those jobs identified?

(Docket No. 10, p. 59 of 395). VE Holderead answered in the negative, stating that there would be no jobs for such an individual (Docket No. 10, p. 59 of 395). Furthermore, the VE stated that there would be no other work for this individual either (Docket No. 10, p. 60 of 395).

On cross-examination, Plaintiff's counsel posed the following question to the VE:

. . . building off of the second hypothetical, that the sedentary with the no temperature

7

extremes, no concentrated exposure to dust, fumes, respiratory irritant. If, in addition to that, the individual was only able to stand and walk for one-half hour during the day and was limited to walking about [fifteen] to [twenty] steps when they were on their feet.

(Docket No. 10, p. 60 of 395). The VE responded that there would be no work for such an individual (Docket No. 10, p. 60 of 395).

**B.    MEDICAL RECORDS**

Plaintiff's medical records regarding his diabetes date back to February 5, 2007, when Plaintiff was seen by Maryann Woods, CNP ("Ms. Woods") (Docket No. 10, p. 210 of 395). Plaintiff reported exercising for thirty minutes on most days but admitted to not counting carbohydrates as previously ordered (Docket No. 10, pp. 210-11 of 395). On March 19, 2007, Plaintiff saw Dr. Moises Auron-Gomez, M.D. ("Dr. Auron-Gomez") complaining of knee, ankle, and hand pain that worsened with activity (Docket No. 10, p. 205 of 395). Plaintiff reported having one recent episode of hypoglycemia and indicated that he was exercising fifteen minutes per day and following a diabetic diet (Docket No. 10, pp. 205-06 of 395). Plaintiff reported similar compliance with his diet and exercise plan during an appointment with Dr. Auron-Gomez on June 25, 2007 (Docket No. 10, p. 197 of 395). During an appointment with Dr. Mariah Schumacher ("Dr. Schumacher"), it was determined that Plaintiff likely suffered from glaucoma as a result of his diabetes (Docket No. 10, p. 231 of 395).

On March 12, 2009, Dr. Eulogio Sioson, M.D. ("Dr. Sioson") performed a one-time disability evaluation of Plaintiff (Docket No. 10, p. 249 of 395). In addition to pulmonary ailments, Dr. Sioson confirmed that Plaintiff suffered from diabetes (Docket No. 10, p. 249 of 395). According to Dr. Sioson, Plaintiff's blood sugar levels ranged from 96 to 230 and Plaintiff suffered from blurry vision and increased thirst at all times (Docket No. 10, p. 249 of 395). On January 2, 2010, Plaintiff was seen by Dr. Joy Marshall, M.D. ("Dr. Marshall"), who diagnosed Plaintiff with "uncontrolled diabetes"

(Docket No. 10, p. 390 of 395). By October 28, 2010, Dr. Marshall reported that Plaintiff had "very out of control diabetes," with Plaintiff's blood sugar level often between 200 and 300 (Docket No. 10, p. 287 of 395). During that visit, Plaintiff admitted to not taking his insulin as often as he should, for fear that he would run out and not have the financial capability of refilling the prescription (Docket No. 10, p. 287 of 395). On November 22, 2010, Dr. Marshall told Plaintiff that he needed to get his sugar level to below 150 on a regular basis (Docket No. 10, p. 387 of 395). By December 17, 2010, Dr. Marshall determined that Plaintiff was "chasing" his sugars, meaning that he was taking his insulin depending on what his blood sugar level was after he ate (Docket No. 10, p. 383 of 395). Dr. Marshall advised against this tactic and stated that Plaintiff was used "to living with his insulin too high" (Docket No. 10, pp. 383-84 of 395).

Plaintiff also suffers from pulmonary issues, namely COPD and obstructive sleep apnea. On July 29, 2008, Dr. Basem Haddad, M.D. ("Dr. Haddad") agreed with Plaintiff's suspected diagnosis of COPD (Docket No. 10, pp. 247-48 of 395). Dr. Haddad recommended Plaintiff undergo a Pulmonary Function Test ("PFT") to confirm the diagnosis and determine the degree of reversibility with bronchodilators (Docket No. 10, p. 248 of 395). Plaintiff underwent the PFT on August 4, 2008 (Docket No. 10, p. 244 of 395). Results of the testing showed that Plaintiff suffered from a severe degree of obstructive lung disease with the presence of air trapping (Docket No. 10, p. 244 of 395). On March 12, 2009, Dr. Sioson agreed with this diagnosis (Docket No. 10, p. 250 of 395). However, in contrast to Dr. Haddad's findings nearly one year earlier, Dr. Sioson found Plaintiff's COPD to be significantly improved with use of a brochodilator (Docket No. 10, pp. 250, 256 of 395).

In 2010, Plaintiff made two trips to the Lutheran Hospital Emergency Room, both times complaining of shortness of breath (Docket No. 10, pp. 299, 313 of 395). Both times, Emergency

Room staff found Plaintiff's lungs to be clear and Plaintiff was discharged (Docket No. 10, pp. 301, 315 of 395). Plaintiff was also treated by Dr. Marshall for his COPD several times in 2010 (Docket No. 10, pp. 287, 302, 383, 387, 390, 393 of 395). Dr. Marshall generally found Plaintiff to be short of breath but with clear lungs without wheezing or rhonchi (Docket No. 10, pp. 387, 393 of 395). On Plaintiff's last visit to Dr. Marshall, he came into the office on oxygen (Docket No. 10, p. 383 of 395).

The remainder of Plaintiff's medical record is centered upon numerous visits with Dr. Laurence Bilfield, M.D. ("Dr. Bilfield"), who treated Plaintiff for bilateral carpal tunnel syndrome (Docket No. 10, pp. 357-59, 361-70, 373-82 of 395) and ongoing right knee pain and discomfort (Docket No. 10, pp. 340-42, 344-45, 349-51, 352-57, 358 of 395). Plaintiff was diagnosed with carpal tunnel syndrome in both hands and had surgery done on his left hand in February 2011 and on his right in May 2011 (Docket No. 10, p. 357 of 395).

Plaintiff first began complaining of right knee pain and discomfort on August 17, 2011 (Docket No. 10, p. 358 of 395). On August 31, 2011, Plaintiff rated this pain a ten out of a possible ten and was sent for an MRI (Docket No. 10, pp. 352-53 of 395). Plaintiff underwent this MRI on September 9, 2011 (Docket No. 10, p. 355 of 395). This scan showed that Plaintiff's ligaments, menisci, cartilage and tendons were intact (Docket No. 10, pp. 355-56 of 395). Plaintiff was diagnosed with minimal degenerative chrondal changes (Docket No. 10, p. 356 of 395). On September 14, 2011, Plaintiff was still complaining of right knee pain and opted to undergo surgical arthroscopy (Docket No. 10, p. 349 of 395). Plaintiff had this procedure in mid-September 2011, and was prescribed anti-inflammatories and physical therapy thereafter  (Docket No. 10, pp. 340-41, 344 of 395).

C.    **EVALUATIONS**

On March 24, 2009, Plaintiff underwent a Physical Residual Functional Capacity Assessment

10

evaluation with stage agency physician Dr. Nick Albert, M.D. ("Dr. Albert") (Docket No. 10, pp. 262-69 of 395). Dr. Albert determined that Plaintiff could: (1) lift and/or carry twenty pounds occasionally; (2) lift and/or carry ten pounds frequently; (3) stand and/or walk for a total of six hours in an eight-hour workday; (4) sit for a total of six hours in an eight-hour workday; and (5) engage in unlimited pushing and/or pulling (Docket No. 10, p. 263 of 395). Plaintiff had no postural, manipulative, visual, or communicative limitations (Docket No. 10, pp. 264-66 of 395). Dr. Albert recommended that Plaintiff avoid even moderate exposure to extreme cold and heat, humidity, and fumes, odors, dusts, gases, and poor ventilation (Docket No. 10, p. 266 of 395). On June 26, 2009, state agency physician Dr. Willa Caldwell, M.D. ("Dr. Caldwell") agreed with Dr. Albert's assessment (Docket No. 10, p. 271 of 395).

## IV. STANDARD OF DISABILITY

The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical for purposes of this case, and are found at 20 C.F.R. §§ 404.1520 and 416.920. *Colvin v. Barnhart,* 475 F.3d 727, 730 (6th Cir. 2007). DIB and SSI are available only for those who have a "disability." 42 U.S.C. § 423(a), (d); *see also* 20 C.F.R. § 416.920. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Colvin,* 475 F.3d at 730 (*citing* 42 U.S.C. § 423(d)(1)(A)) (definition used in the DIB context); *see also* 20 C.F.R. § 416.905(a) (same definition used in the SSI context).

The Commissioner uses a five-step sequential evaluation process to evaluate a DIB or SSI claim. First, a claimant must demonstrate he is not engaged in "substantial gainful activity" at the time

he seeks disability benefits. *Colvin*, 475 F.3d at 730 (*citing Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). Second, a claimant must show he suffers from a "severe impairment." *Colvin*, 475 F.3d at 730. A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id*. (*citing Abbott,* 905 F. 2d at 923). At the third step, a claimant is presumed to be disabled regardless of age, education, or work experience if he is not engaged in substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets the requirements of a "listed" impairment. *Colvin*, 475 F.3d at 730.

Prior to considering step four, the Commissioner must determine a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(e), 416.920(e). An individual's residual functional capacity is an administrative "assessment of [the claimant's] physical and mental work abilities – what the individual can or cannot do despite his or her limitations." *Converse v. Astrue*, 2009 U.S. Dist. LEXIS 126214, *16 (S.D. Ohio 2009); *see also* 20 C.F.R. § 404.1545(a). It "is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis . . . A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Converse*, 2009 U.S. Dist. LEXIS 126214 at *17 (*quoting SSR* 96-8p, 1996 SSR LEXIS 5 (July 2, 1996) (emphasis in original) (internal citations omitted)).The Commissioner must next determine whether the claimant has the residual functional capacity to perform the requirements of his past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). If he does, the claimant is not disabled.

Finally, even if the claimant's impairment does prevent him from doing past relevant work, the claimant will not be considered disabled if other work exists in the national economy that he can perform. *Colvin*, 475 F.3d at 730 (*citi*ng *Heston v. Comm'r of Soc. Sec*., 245 F.3d 528, 534 (6th Cir.

12

2001) (internal citations omitted) (second alteration in original)). A dispositive finding by the

Commissioner at any point in the five-step process terminates the review. *Colvin*, 475 F.3d at 730

(*citing* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)).

## V. THE COMMISSIONER'S FINDINGS

After careful consideration of the disability standards and the entire record, ALJ Terry made

the following findings:

1.      Plaintiff meets the insured status requirements of the Social Security Act through March 31, 2013.

2       Plaintiff has not engaged in substantial gainful activity since August 11, 2008, the application date.

3.      Plaintiff has the following severe impairments: chronic obstructive pulmonary disease, diabetes mellitus, obesity, emphysema, asthma, and sleep apnea.

4.      Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1.

5.      Plaintiff has the residual functional capacity to perform a range of light work. Plaintiff is able to lift and/or carry and push and/or pull twenty pounds occasionally and ten pounds frequently; sit for six hours at a time for a total of eight hours in an eight-hour work day and stand and/or walk for two hours at a time for a total of six hours in an eight-hour work day. There are no postural, environmental, or manipulative limitations. Plaintiff is limited to positions where English is not required. Plaintiff is to avoid concentrated exposure to respiratory irritants, dust, fumes, and temperature extremes.

1.      Plaintiff is capable of performing his past relevant work as a food assembler since this work does not require the performance of work-related activities precluded by his residual functional capacity.

2.      Plaintiff has not been under a disability, as defined by the Social Security Act, since August 11, 2008, the date the application was filed.

(Docket No. 10, pp. 23-32 of 395). ALJ Terry denied Plaintiff's request for DIB and SSI benefits

(Docket No. 10, p. 32 of 395).

13

## VI. STANDARD OF REVIEW

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3). *McClanahan v. Comm'r of Soc. Sec.,* 474 F.3d 830, 832-33 (6th Cir. 2006). In conducting judicial review, this Court must affirm the Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact that are unsupported by substantial evidence. *Id.* (*citing Branham v. Gardner*, 383 F.2d 614, 626-27 (6th Cir. 1967)). "The findings of the [Commissioner] as to any fact if supported by substantial evidence shall be conclusive . . ." *McClanahan*, 474 F.3d at 833 (*citing* 42 U.S.C. § 405(g)). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *McClanahan*, 474 F.3d at 833 (*citing Besaw v. Sec'y of Health and Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992)). "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion . . . This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *McClanahan*, 474 F.3d at 833 (*citing Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted)).

## VII. DISCUSSION

### A.  PLAINTIFF'S ALLEGATIONS

In his Brief on the Merits, Plaintiff alleges the ALJ's decision was not supported by substantial evidence with regard to either: (1) Plaintiff's meeting the criteria of § 3.02 of the Listed Impairments; or (2) Plaintiff's residual functional capacity (Docket No. 15). Plaintiff also alleges that the ALJ erred by relying on VE testimony that directly conflicted with the DOT, for which no explanation was

14

provided (Docket No. 15).

**B.    DEFENDANT'S RESPONSE**

Defendant contends: (1) the ALJ correctly determined that Plaintiff's combination of impairments does not meet § 3.02 of the Listed Impairments, as required; (2) substantial evidence supports the ALJ's determination that Plaintiff can perform a range of light work; and (3) the VE verified that his testimony was consistent with the DOT (Docket No. 17).

**C.    DISCUSSION**

**1.    LISTED IMPAIRMENT**

Plaintiff contends the ALJ erred by determining that Plaintiff's pulmonary problems did not meet the level required by the Social Security Administration in its Listed Impairments (Docket No. 15, p. 6 of 12). Specifically, Plaintiff alleges that nothing in Listing § 3.02(A) requires Plaintiff's PFT levels be checked both pre and post-bronchodilator treatment (Docket No. 15, p. 6 of 12). Plaintiff is correct: nothing in § 3.02(A) requires a claimant to provide proof of his PFT levels both pre and post-bronchodilator. 20 C.F.R. § 404, Subpart P, Appendix 1, § 3.02(A). However, as Defendant correctly points out, such a requirement *is* listed in the introduction to Section 3.00 under paragraph E.

Section 3.00(E) specifically states:

> Spirometry *should be repeated after administration of an aerosolized brochodilator* under supervision of the testing personnel if the pre-bronchodilator FEV [1] value is less than 70 percent of the predicted normal value . . . If a bronchodilator is not administered, the reason should be clearly stated in the report. Pulmonary function studies performed to assess airflow obstruction without testing after bronchodilators *cannot be used to assess levels of impairment in the range that prevents any gainful work activity*, unless the use of bronchodilators is contraindicated.

20 C.F.R. § 404, Subpart P, Appendix 1, § 3.00(E) (emphasis added). Although nothing in the records from Plaintiff's August 27, 2009, PFT indicate that a bronchodilator was not administered, the records

15

do not indicate that a bronchodilator *was* administered, either (Docket No. 10, pp. 277-79 of 395). Given that Plaintiff's previous PFT, conducted by Dr. Sioson on March 13, 2009, specifically indicated pre and post-bronchodilator levels (Docket No. 10, p. 256 of 395), it was reasonable for ALJ Terry to assume that *had* bronchdilators been using during the August 2009 test, the results would so indicate.

Under § 3.02(A), a claimant standing between sixty-four and sixty-five inches tall must have an FEV[1] score of 1.25 or lower in order to meet Social Security Listed Impairment requirements. 20 C.F.R. § 404, Subpart P, Appendix 1, § 3.02(A). If a claimant's FEV[1] level is less than seventy percent (70%) of the predicted normal value, the claimant must undergo post-bronchodilator testing. Plaintiff is sixty-five inches tall (Docket No. 10, p. 393 of 395). In August 2009, Plaintiff's FEV[1] score was 1.17, or thirty-four percent (34%) of the predicted normal value (Docket No. 10, p. 277 of 395). No bronchodilator was administered (Docket No. 10, pp. 277-79 of 395). No where in the PFT results does the testing physician indicate *why* a bronchodilator was not administered (Docket No. 10, pp. 277-79 of 395). This failure to administer a bronchodilator renders the August 2009 PFT ineligible for purposes of determining Plaintiff's level of impairment. Plaintiff's first assignment of error is without merit on this basis alone.

However, it is important to point out that Plaintiff's August 2009 PFT fails for another reason as well. Section 3.00(E) requires a claimant to undergo three forced expiratory maneuvers during the course of a PFT. 20 C.F.R. § 404, Subpart P, Appendix 1, § 3.00(E). The paragraph specifically states, "the reported one-second forced expiratory volume (FEV[1]) and forced vital capacity (FVC) should represent the largest of at least *three* satisfactory forced expiratory maneuvers." 20 C.F.R. § 404, Subpart P, Appendix 1, § 3.00(E) (emphasis added). Plaintiff's August 2009 PFT specifically states

16

that only one test maneuver was administered (Docket No. 10, p. 277 of 395). Therefore, the August 2009 PFT is ineligible for the purpose of determining Plaintiff's level of impairment.

Because Plaintiff's August 2009 PFT did not meet the requirements of § 3.02, the ALJ was correct in finding that Plaintiff does not suffer from an impairment or combination of impairments that meets or medically equals one of the Listed Impairments. Plaintiff's first assignment of error is without merit and the decision of the Commissioner must be affirmed.

## 2. RESIDUAL FUNCTIONAL CAPACITY

In his second claim, Plaintiff alleges the ALJ erred when he determined Plaintiff was capable of performing a range of "light" work (Docket No. 15, p. 7 of 12). To properly determine a claimant's ability to work and the corresponding level at which that work may be performed, the ALJ must determine the claimant's residual functional capacity. *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004). According to Social Security Regulations, residual functional capacity is designed to describe the claimant's physical and mental work abilities. *Id*. Residual functional capacity is an administrative "assessment of [the claimant's] physical and mental work abilities – what the individual can or cannot do despite his or her limitations." *Converse v. Astrue*, 2009 U.S. Dist. LEXIS 126214, *16 (S.D. Ohio 2009); *see also* 20 C.F.R. § 404.1545(a). Residual functional capacity "is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis . . . A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Converse*, 2009 U.S. Dist. LEXIS 126214 at *17 (*quoting SSR 96-8p*, 1996 SSR LEXIS 5 (July 2, 1996) (emphasis in original) (internal citations omitted)).

To determine a claimant's residual functional capacity, the Commissioner will make an assessment based on all relevant medical and other evidence. 20 C.F.R. § 20.1545(a)(3). Before

making a final determination a claimant is not disabled, the Commissioner bears the responsibility of developing the claimant's complete medical history. 20 C.F.R. § 20.1545(a)(3). The Commissioner "will consider any statements about what [a claimant] can still do that have been provided by medical sources, whether or not they are based on formal medical examinations. [The Commissioner] will also consider descriptions and observations of [a claimant's] limitations from [his] impairment(s), including limitations that result from [his] symptoms, such as pain, provided by [claimant], [his] family, neighbors, friends, or other persons." 20 C.F.R. § 20.1545(a)(3). Responsibility for deciding residual functional capacity rests with the ALJ when cases are decided at an administrative hearing. *Webb*, 368 F.3d at 633.

In the present case, ALJ Terry found, upon consideration of the entire record, that Plaintiff had the residual functional capacity to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) (Docket No. 10, p. 26 of 395). The ALJ determined that Plaintiff

> is able to lift and/or carry and push and/or pull [twenty] pounds occasionally and [ten] pounds frequently; sit for six hours at a time [for] a total of eight hours in an eight hour work day; and stand and/or walk for two hours at a time [for] a total of six hours in an eight hour work day. There are no postural, environmental, or manipulative limitations. The claimant is limited to positions where English is not required. Further, the claimant is to avoid . . . concentrated exposure to respiratory irritants, dust, . . . fumes . . . and temperature extremes.

(Docket No. 10, p. 26 of 395).

The ALJ based his residual functional capacity determination upon several factors. First, ALJ Terry cited to the fact that Plaintiff's symptoms are not as severe as he alleges (Docket No. 10, p. 27 of 395).

Not only did Plaintiff's August 2009 PFT fail to satisfy the listing level, discussed *supra*, his symptoms actually improved with bronchodilation, as evidenced by the following chart:

|  | FEV 1 |  | FVC |  |
|---|---|---|---|---|
|  | Pre | Post | Pre | Post |
| August 4, 2008 | 1.39 | 1.47 | 3.02 | 3.34 |
| March 12, 2009 | 1.18 | 1.67 | 3.13 | 3.75 |
| August 27, 2009 | 1.17 |  | 2.28 |  |

Furthermore, Plaintiff asserts only two recent hospitalizations related to his breathing difficulties, one in February 2010 (Docket No.10, p. 313 of 395) and one in October 2010 (Docket No. 10, p. 299 of 395). Both times hospital staff deemed Plaintiff to be in only "mild distress" (Docket No. 10, pp. 294, 318 of 395). Both times, Plaintiff received nebulizer treatments and gained satisfactory 100% oxygen blood gas saturation after only one treatment (Docket No. 10, pp. 321-22, 335 of 395).

Second, ALJ Terry noted that none of Plaintiff's treating physicians, Drs. Bilfield, Marshall, Haddad, or Auron-Gomez, placed any limitation whatsoever on Plaintiff's ability to work (Docket No. 10, pp. 193-395 of 395). In fact, the only physician to restrict Plaintiff's ability to work in some manner was the state agency consultant, Dr. Albert (Docket No. 10, pp. 262-69 of 395). In Plaintiff's initial Disability Report he indicated that his previous employer sent him to a company doctor who ordered Plaintiff to stop working (Docket No. 10, p. 147 of 395). In his Disability Report appeal, Plaintiff claimed that his doctor told him he could no longer work (Docket No. 10, p. 169 of 395). However, Plaintiff provides no proof of these orders. By his own admission, Plaintiff does not have difficulty with using his hands, standing, kneeling, seeing, squatting, hearing, sitting, reaching or talking (Docket No. 10, p. 142 of 395).

Third, the ALJ chose to discount the testimony of Plaintiff, citing credibility issues, namely Plaintiff's non-compliance with treatment recommendations (Docket No. 10, pp. 27-29 of 395). A review of the record confirms ALJ Terry's conclusions. Although Plaintiff claimed, in October 2010, that he stopped taking his medications for fear of running out and not being able to afford a refill,

Plaintiff was fully employed and insured in July 2008, when Dr. Haddad noted Plaintiff's poor

compliance with treatment (Docket No. 10, p. 247 of 395). Plaintiff has also failed to lose weight,

despite numerous recommendations to do so (Docket No. 10, pp. 208, 390 of 295).[3]

ALJ Terry also made note of Plaintiff's receipt of unemployment benefits (Docket No. 10, p.

29 of 395). According to Plaintiff, he began receiving unemployment benefits in 2008 and continued to

receive them until just before the administrative hearing (Docket No. 10, p. 51 of 395). When asked by

the ALJ, Plaintiff stated that he was aware that, in order to receive unemployment benefits, he had to

certify that he was able to work (Docket No. 10, p. 51 of 395). Plaintiff indicated that when he first

began accepting unemployment benefits, he was in "better shape" (Docket No. 10, pp. 29, 51 of 395).

This Magistrate agrees with the ALJ: by receiving unemployment benefits during his alleged

period of disability, Plaintiff felt that he was capable of working and in fact reported that he was

looking for work (Docket No. 10, p. 29 of 395). This fact casts doubt over Plaintiff's current claims

that he has not been able to work since August 2008. Even if, as Plaintiff alleges, his symptoms have

recently gotten worse, Plaintiff likely has not experienced a disability, as defined by the Social

Security Regulations, for the required twelve-month period of time. For example, according to

Plaintiff, he only required oxygen on a full-time basis since November 2010, only three weeks prior to

the administrative hearing (Docket No. 10, p. 45 of 395). For these reasons, Plaintiff's second

assignment of error is without merit and the decision of the Commissioner must be affirmed.

### 3.    VE TESTIMONY

Plaintiff alleges that the ALJ erred by relying on testimony from the VE that conflicted with the

---

[3] In Plaintiff's earliest submitted medical record, dated February 5, 2007, Plaintiff
weighed 228 pounds (Docket No. 10, p. 210 of 395). By September 21, 2011, Plaintiff weighed
235 pounds (Docket No. 10, p. 347 of 395).

DOT (Docket No. 15, p. 9 of 12). Specifically, Plaintiff claims that the VE's testimony that Plaintiff could perform jobs with a specific vocational preparation ("SVP") skill level of two or three directly conflicts with Plaintiff's testimony that he does not speak English (Docket No. 15, pp. 9-10 of 12). SVP is "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." *Dictionary of Occupational Titles*, 4th Edition. An SVP of one requires a worker to "speak simple sentences, using normal word order, and present and past tenses." *Id*. An SVP of two requires a worker to "speak clearly and distinctly with appropriate pauses and emphasis, correct pronunciation, variations in word order, using present, perfect, and future tenses." *Id*. An SVP of three requires a worker to "speak before an audience with poise, voice control, and confidence, using correct English and well-modulated voice." *Id*. Plaintiff claims that, since he does not speak English, it is impossible for him to qualify for a job with an SVP of two or three (Docket No. 15, p. 10 of 12).

> According to Social Security Regulations,
>
> Occupational evidence provided by a VE . . . generally should be consistent with the occupational information supplied by the DOT. When there is an apparent unresolved conflict between VE . . . evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE . . . evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.

SSR No. 00-4p, 2000 SSR LEXIS 8 (Dec. 4, 2000).  ALJ Terry specifically asked the VE if his testimony was consistent with the DOT during the administrative hearing, to which the VE responded in the affirmative (Docket No. 10, p. 55 of 395). As a precaution, ALJ Terry then sent the VE a request for a statement, as well as a series of interrogatories, confirming the VE's consistency with the DOT *after* the administrative hearing (Docket No. 10, p. 186 of 395). The VE again stated that his testimony

21

and responses to the ALJ's hypothetical questions were consistent with the DOT (Docket No. 10, p. 187 of 395).

Prior to submitting a request for a statement to the VE following the administrative hearing, ALJ Terry requested permission and consent from Plaintiff's attorney (Docket No. 10, pp. 191-92 of 395). The ALJ's letter to Plaintiff's counsel specifically stated "[i]f I do not receive a response from you within 10 days of the date you receive the vocational expert's response, I will assume that you do not wish to respond and that you do not contest the entry of his response into the evidence" (Docket No. 10, p. 192 of 395). A review of the record reveals no objection by Plaintiff's counsel. Therefore, Plaintiff's third assignment of error is without merit and the Commissioner's decision must be affirmed.

## VIII. CONCLUSION

For the foregoing reasons, the decision of the Commissioner is affirmed.

/s/Vernelis K. Armstrong
United States Magistrate Judge

Date:   December 10, 2012

22